UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA,         \*     Docket No. 15-136
                                 \*
                  Plaintiff,     \*
                                 \*
VS                            \*     January 13, 2016
                                 \*
BEAU M. WATTIGNEY,             \*
                                 \*
                  Defendant.    \*     Section B
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**REPORTER'S OFFICIAL TRANSCRIPT OF THE SENTENCING HEARING
BEFORE THE HONORABLE IVAN L. R. LEMELLE,
UNITED STATES DISTRICT JUDGE.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**APPEARANCES:**

For the Government:          U.S. Attorney's Office
                                BY: JORDAN GINSBERG
                                650 Poydras Street, Ste. 1600
                                New Orleans, LA  70130

                                U.S. Department of Justice
                                BY:  MARIE-FLORE JOHNSON
                                1301 New York Avenue NW, Ste. 600
                                Washington, DC  20530

For the Defendant:           Law Office of Roger W. Jordan, Jr.
                                BY: ROGER W. JORDAN, JR.
                                  829 Baronne Street
                                New Orleans, LA  70113

**REPORTED BY:**    Mary V. Thompson, RMR, FCRR
                  500 Poydras Street, Room. 275
                  New Orleans, Louisiana 70130
                  (504)589-7783

**P R O C E E D I N G S**

(Call to order of the court.)

THE COURT:  Isadore, let's call it.

THE CASE MANAGER:  Criminal Action 15-136,

*United States versus Beau Wattigney.*

THE COURT:  Counsel.

MR. JORDAN:  Good afternoon, Your Honor.  Roger Jordan for Beau Wattigney, who is present in court.

MS. JOHNSON:  Marie-Flore Johnson, for the Department of Justice Computer Crime and Intellectual Property Section, and Jordan Ginsberg, U.S. Attorney's office, New Orleans, Louisiana.

THE COURT:  All right.  Let's have the defendant give us his full name for the record, please.

THE DEFENDANT:  It's Beau Morgan Wattigney.

THE COURT:  Mr. Wattigney, have you had a chance to go over the presentence report along with all the memoranda filed by not only your side, but also the government in connection with your case?

THE DEFENDANT:  Yes, sir, I have.

THE COURT:  And, Counsel, I know that you have stated on behalf of your client some objections to the report.

I also have the government's memo in aid of the sentencing along with your memo on behalf of the defendant in aid of sentencing as well.

In terms of those objections, are all those objections

1   still at issue?

2       MR. JORDAN:  Your Honor, the only objections that are

3   really at issue, I believe, would be Objections 3, 4, and 5

4   which would be concerning the defendant's criminal history as

5   well as what category he would be in based on that criminal

6   history.

7       THE COURT:  Mr. Wattigney, do you agree with what your

8   lawyer just said?

9       THE DEFENDANT:  Yes, sir, I do.

10      THE COURT:  And do you agree, then, to dismiss as moot

11  the other objections?

12      MR. JORDAN:  Yes, sir.

13      THE COURT:  Do you agree with that, Mr. Wattigney?

14      THE DEFENDANT:  Yes, sir, I do.

15      THE COURT:  All right.  We'll dismiss all the other

16  ones.

17      As to Objections 3, 4, and 5, as both sides should be

18  aware, you've received the probation officer's addendum to the

19  presentence report in response to those objections, 3, 4, and 5.

20  I've had a chance to review not only that addendum, but the

21  other information and support documentation for the -- not only

22  on the objections, but also the response to the objections.

23      And I am sustaining -- I am overruling Objection

24  No. 3, finding that the docket information on that particular

25  matter shows that the defendant pled guilty under Louisiana Code

of Criminal Procedure Article 894, which deals with suspension and deferral of a sentence. I'm well familiar with that particular provision. I've applied it and seen case law in that regard.

And basically, when a defendant has been convicted of a misdemeanor, the Court may suspend the imposition and execution in whole or in part of the sentence imposed. Based on the plain text of the Code of Criminal Procedure, a finding or admission of guilt is required for a defendant to be eligible for relief under Article 894. The conviction at issue in that case number, Docket No. 0251814, is scorable under federal sentencing guideline provision, specifically 4A1.1(c) despite the fact that that conviction might have been later dismissed.

Based upon that information, the Court maintains the defendant's criminal history score as being correct.

While not necessarily dependent upon these additional reasons I'm about to give, but under Louisiana law -- unless it's changed since I've last looked at this -- certain offenses can be used to charge someone under state law as a second offender despite the fact that the first offense might have been resolved through Article 894. Therefore, for all of the above reasons, Objection No. 3 is overruled.

As regards to Objections 4 and 5, the defendant maintains that, due to his third objection, his criminal history score and advisory guideline range are incorrect and should be

adjusted. But, again, based upon the ruling that I just made, the criminal history score and advisory guideline range as recommended by probation, for the reasons I just gave, are correct and do not need an adjustment.

I'm overruling, then, defendant Wattigney's Objections 4 and 5 to the guideline calculations and criminal history score, particularly.

As you know also, Counsel, there was some supplemental information that was received from the government, basically victim impact information, updating that information. Again, that's part of the same addendum.

And based upon the additional victim information, Paragraph 101 of the revised PSR was updated to reflect that that additional information would be needed to ascertain a loss as suffered by the individual victims. And due to a large number of victims in the case, additional language was added to Paragraph 107 of the revised PSR as grounds for a variance.

Obviously, everything in the presentence report, including the information that I just mentioned, are considered by the Court, initially, as an advisory type of situation, because the Court does not have to adopt or find as accurate anything in the presentence report, whether it comes directly from probation or from the government or from the defendant. But through my own independent analysis and review of pertinent information and the history of this case, we find that probation

1   has accurately scored the presentence report.

2          Probation has also, with the revisions that it's made,

3   made accurate and reasonable factual representations, and we

4   adopt those for purposes of sentencing here.

5          That, however, does not foreclose the possibility of a

6   downward or an upward variance from the properly scored

7   guideline calculations.  The Court always has discretion to do

8   so.  They're not bound by anyone's assessment, probation's or

9   anyone else's, regarding the applicability or non-applicability

10  of any downward variances, departures upwards or downwards.

11         To that extent, then, we'll hear from both sides for

12  purposes of considering any particular things along those lines.

13         As both of you are aware, since you've exchanged it,

14  and I've also alluded to it earlier, both sides have submitted

15  to us sentencing memoranda in this particular case.  I've

16  reviewed that as well.  I know that the defendant submits their

17  memorandum as a request for a downward departure or downward

18  variance.  I reviewed that.  I reviewed the government's memo,

19  and supporting materials as well, concerning the possible

20  sentencing options that the Court has.

21         To that extent, Mr. Wattigney, you have a right to

22  make a statement prior to sentencing, your lawyer, as well as

23  the government's lawyer, also has a right to make a statement

24  prior to sentencing.

25         Would you like to make a statement prior to

1   sentencing?  Do you want to go now?  Do you want to wait for

2   your lawyer?  What's your option?

3            MR. JORDAN:  If I may make a brief objection,

4   Your Honor, first with the trial court's ruling on the criminal

14:28:07
5   history category, briefly, Your Honor, with all respect.

6            I was submitted that by the probation officer, the

7   PSR, and there are actually two case numbers.  I would not have

8   objected to an 894 plea knowing it's a deferred adjudication and

9   it does meet the requirements for a point for a misdemeanor.

14:28:26
10  However, there were actually two that were counted.

11           Case No. 251814, I submitted paperwork showing that

12  that was dismissed by the prosecution.

13           Case No. 251816 was actually entered as a plea of 894,

14  and the probation officer indicated that was concurrent.

14:28:46
15  Therefore, the assumption was made it would be have been

16  concurrent with the one that actually reflects it was actually

17  dismissed by the prosecution.

18           In actuality, Your Honor, there was an underlying

19  traffic offense with that which I showed --

14:28:55
20           THE COURT:  Counsel, I saw all of that in your

21  paperwork.  Do you have anything new you want to give me?

22           MR. JORDAN:  No, sir, there is nothing.

23           THE COURT:  All right.  Your objection is noted.

24           MR. JORDAN:  Thank you, Your Honor.

14:29:04
25           THE COURT:  Thank you.  What does your client want to

1  do at this time?

2      MR. JORDAN:  Your Honor, we would like to present some

3  brief testimony.  With the Court's indulgence, I had two

4  witnesses who wanted to testify on his behalf, if the Court

5  would allow that, as well as Mr. Wattigney to make his statement

6  to the Court.

7      THE COURT:  For what purpose?

8      MR. JORDAN:  For consideration of sentencing.

9      But if the Court would not, I would --

10     THE COURT:  I always give -- I mean, every defendant

11  has a right.  I don't foreclose a defendant's right to allocute

12  prior to sentencing.

13     But as far as statements about someone's good

14  character or what have you, I generally allow a member of the

15  family, or some other representative that the defendant wishes

16  the Court to hear from, to give some statement about their

17  relationship with the defendant in mitigation of punishment.  Is

18  that basically what you have?

19     MR. JORDAN:  Yes, sir.

20     THE COURT:  Who does he have that he would like to

21  give a statement on his behalf?

22     MR. JORDAN:  He had two, but we would only call one.

23  It would be someone he worked with and a friend.

24     THE COURT:  That's fine.  I'll allow that.  But I

25  don't take it as a form of testimony.  They could come to the

1  podium and make a statement in his behalf, and we'll proceed in

2  that manner.

3       Once they make their presentation, does your client

4  want to wait for you or does he want to go before you to make

14:30:15  5  his allocution statement?

6       MR. JORDAN:  He'd like to make his allocution after

7  that, Your Honor.

8       THE COURT:  Okay.  That's fine.

9       MR. JORDAN:  Your Honor, at this time --

14:30:21  10       THE COURT:  Call your supporting person.

11       MR. JORDAN:  The defense would call Patricia Marshall

12  to the stand -- or to the podium.

13       THE COURT:  Ms. Marshall, would you come to the

14  podium, ma'am.

14:30:30  15       MR. JORDAN:  Pardon me, Your Honor?

16       THE COURT:  I'm having her come to the podium.

17       When you get to the podium, ma'am, give us your full

18  name and your relationship to the defendant.

19       THE WITNESS:  My name is Patricia Marshall, and I am a

14:30:45  20  colleague of Beau Wattigney's.

21       THE COURT:  You're a what?  I'm sorry.

22       THE WITNESS:  Colleague.  Coworker.

23       THE COURT:  A coworker.  And in what connection?

24  Which job, which capacity?

14:30:55  25       THE WITNESS:  I work with ITT Technical Institute, and

1    I work in the career services department.  My title is career

2    services specialist.  And I met Beau probably around 2007, 2008

3    when he began his educational career with ITT Technical

4    Institute.

14:31:11

5            THE COURT:  Were you an administrator or a teacher or

6    what?

7            THE WITNESS:  An administrator.

8            THE COURT:  And what was he with that entity?

9            THE WITNESS:  At the beginning he was a student, but

14:31:22

10    through his good grades and integrity, he became an employee.

11            THE COURT:  And do you know what period of time he was

12    employed with ITT?

13            THE WITNESS:  I believe it was around 2012 or 2013

14    until his dismissal.

14:31:38

15            THE COURT:  When was he dismissed?

16            THE WITNESS:  2014.

17            THE COURT:  All right.  When you say he's a colleague,

18    are you a supervisor or a coworker?

19            THE WITNESS:  Coworker.

14:31:48

20            THE COURT:  And ITT Technical Institute, is that in --

21            THE WITNESS:  St. Rose, Louisiana.

22            THE COURT:  St. Rose.  And what was his title at that

23    entity?

24            THE WITNESS:  He was in systems.

14:32:02

25            THE COURT:  I'm sorry?

THE WITNESS:  It was SST, systems support technician.

THE COURT:  What's a network administrator?

THE WITNESS:  He pretty much took care of all of the IT around the campus, our local campus.

Also he was the supervisor of federal work-study students under the IT program.

THE COURT:  Because the title you gave me, when I asked you that, was different from what he gave probation as network administrator.

THE WITNESS:  It's the same.

THE COURT:  Okay.  And is there anything else you'd like to tell me about him, other than that he's been a good employee and you found him to be credible and honest during that period?

THE WITNESS:  I would like you to also take into consideration prayerfully that Beau does recognize that he did wrong.  We've had several conversations, and he is regretful. He is remorseful about it.  And please take that into consideration when you are sentencing him.

THE COURT:  And how often did you see him when y'all worked together at ITT?

THE WITNESS:  Five days a week.

THE COURT:  Has he ever been known while -- to your knowledge, while working there, to promise to do something and then didn't do it?

1   THE WITNESS:  No, sir, I never had that problem with
2   him at all.
3   THE COURT:  Or offered various excuses that perhaps
4   turned out to be questionable as to why he didn't do something?
5   THE WITNESS:  No, sir.  I'm --
6   THE COURT:  Are you aware of some issues here?
7   THE WITNESS:  Here in the courtroom?
8   THE COURT:  This case.
9   THE WITNESS:  The only thing that I know is a lot of
10  hearsay and when I was questioned by the FBI on campus about
11  packages that I didn't have any knowledge of.  That's about my
12  full extent of...
13  THE COURT:  Since this case -- or since your awareness
14  of this case, and either through the hearsay you mentioned or
15  through conversations with the defendant or anyone else, what do
16  you think you know about this case, if anything?
17  THE WITNESS:  What I think I know is that he did
18  something illegal on the Internet.  And I can't really speculate
19  because my Internet is Facebook, so I really don't know.
20  THE COURT:  I don't know if you're aware of it, but,
21  of course, I have, I guess, more information about him, his
22  crime and some other things, his background, than maybe even he
23  knows about his background and in this case.  And it's contained
24  in what we call a presentence report.  It's an 85-page report
25  with some addenda.

One of the things that gives me a picture into every defendant is not just their criminal history -- and he's got a few things in here -- but it also gives me some things about his personal history characteristics, his health. It tells me a little bit about his mental/emotional health. A lot of that is based upon information that he tells probation and others. Medications. It talks a bit about any chemical dependency issues or drug abuse issues.

Was there ever an indication -- or are you aware of -- and I'm not saying that it's for punishment purposes, because I like to try to get people help for their health problems including addiction problems, which to me is an illness.

Were you aware of anything along those lines?

THE WITNESS: No, sir, I personally was not aware of it.

THE COURT: And in regards to ITT, does ITT have a urinalysis-type -- random urinalysis program, or whatever, to test its employees for alcohol or substance use?

THE WITNESS: No. What we do have is the employee assistance program where, if an employee feels that they have a problem, they can call the hotline, and then we set up with certain services to --

THE COURT: And that's confidential, right?

THE WITNESS: Yes, sir.

THE COURT: So you're not aware whether or not the

defendant took advantage of that?

THE WITNESS:  No, sir, I'm not.

THE COURT:  You know, I always try to figure out why to -- why people commit crimes.  It's sometimes -- it's a risky thing to do, and sometimes it's one where I don't assume that the why is as obvious as it might be sometimes.  There are many factors that go into something.  And the "why" is not a question of justification.  It's simply a question as to, again, their motivations.

Have you any suspicions in terms of his motivation committing the crime here?

THE WITNESS:  To be honest with you, sir, no, I don't.

I can only -- when -- I can say, when I was approached by the FBI on our campus, I was completely and utterly shocked. I sat there in front of them and told them I don't believe it, because he's never, ever shown that characteristic to me.

THE COURT:  Are you aware of anyone else that either he or anyone else told you might be involved in this?

THE WITNESS:  No.

THE COURT:  Are you aware or familiar with any of the victims, either personal or corporate victims in this case?

THE WITNESS:  No, sir.

THE COURT:  Have you ever heard of or did he ever talk to you about an entity called CIC or an individual with the last name of Miller?

1    THE WITNESS:  No, sir.

2    THE COURT:  All right.  Thank you, ma'am.

3    THE WITNESS:  You're welcome.  Have a great day.

4    THE COURT:  You, too.

5    Counsel, you wanted your client to go now or after

6    you?

7    MR. JORDAN:  Now, Your Honor, if that's okay with the

8    Court.

9    THE COURT:  Mr. Wattigney, in every case, as I said

10   earlier, every defendant has a right to make what is called an

11   allocution where they present to the Court reasons why they

12   believe the sentence should be mitigated or lessened than what

13   perhaps you might suspect may be coming down the pike, and I

14   always reserve the right to determine sentencing at a sentencing

15   hearing like that.

16   I tell everyone, when you make a statement, be mindful

17   that sometimes I might question the defendant after they make a

18   statement --

19   THE DEFENDANT:  Yes, sir.

20   THE COURT:  -- particularly if I find the statement is

21   somewhat inconsistent to what's before me, and give them an

22   opportunity to explain.

23   One of the first things I'm going to go into, because

24   I want to -- I don't want to hit anyone in the blind, I have a

25   report here from probation which seems that, while you were on

1   pretrial release status, you didn't comply with certain things

2   that they required you to do, including attending drug treatment

3   program sessions, urinalysis sessions, and even coming to

4   probation in order to do so.

14:39:39

5       And you gave reasons why. Either you forgot or you

6   misunderstood or you said they told you something else. And it

7   turns out, when they tried to corroborate what you were saying,

8   they seemed to believe you were lying to them.

9       Do you want to talk about that for me a bit?

14:39:55

10      THE DEFENDANT: Well, first of all, I don't feel I

11  intentionally lied to anybody. I did have a lot of excuses.

12      I think the reality -- and this is just the way I feel

13  about it -- is at the time my doctor was changing my medications

14  rapidly over a month, like a new medication over a week. And I

14:40:12

15  know this is no excuse for me to completely, say, forget

16  everything else, but I feel like it put me in a state where I

17  was no -- I was depressed and no longer motivated to comply.

18      And I don't have any excuse as to why I didn't comply

19  other than I was not in a good state at the time.

14:40:31

20      THE COURT: And you told probation that it's coming

21  down to sentencing, and you just felt, I don't know, maybe

22  frustrated, depressed, and was just giving up or what have you.

23  But when I heard you just now, it was -- it reminded me of an

24  old phrase that I learned years ago when I went with a relative

14:40:54

25  who had an addiction problem. And one of the first things that

1  he learned, he told me, in his counseling sessions was that he

2  had to recognize that he had been in denial about his addiction

3  problem --

4        THE DEFENDANT:  Yes, sir.

5        THE COURT:  -- thinking that he could do it on his

6  own, resolve his problems on his own.  And he was using

7  manipulation to the extent that he made excuses whenever he

8  faltered.

9        Are you in either one of those categories?

10       THE DEFENDANT:  Yes, sir.  I think I can honestly

11 admit I do have an addiction problem.  I have been staying clean

12 lately because of everything that is surrounding me, but in the

13 past I have struggled with addiction.  And particularly during

14 the committing of these crimes and before and after.  I have

15 struggled with both alcohol and drug addiction.

16       THE COURT:  I know the report talks about many of

17 those things, and to your credit, you've acknowledged that

18 particular problem.  But I'm not certain if you're over the fact

19 of what goes along with, I guess, that illness is manipulation.

20 Maybe that's a harsh term, but I don't know of any other term to

21 use.

22       THE DEFENDANT:  Yes, sir.

23       I also suffer from bipolar disorder.  And when I'm

24 taking my medication, I'm okay, and when I'm not, I tend to

25 self-medicate with alcohol and drugs.  And that's when things

1   really get out of control.  I've been back on my medication for
2   several months.
3           THE COURT:  Do you have a sponsor out there?  Someone
4   who's --
5           THE DEFENDANT:  Yes, sir, I do.
6           THE COURT:  -- has walked the path you've been walking
7   who found sobriety?
8           THE DEFENDANT:  I have been attending NANA meetings
9   depending on my schedule, because they only have AA during the
10  day and then NA at night.  But I do have a sponsor.  I'm
11  attending as many meetings as I can.
12          THE COURT:  I want to highlight that for this hearing,
13  because I'm trying to, you know, determine to what extent I
14  should recommend to -- whether it's the Bureau of Prisons or
15  probation for supervisory purposes, some sort of program that
16  you might benefit from, because it seems to me status quo in
17  your case is just not the answer.
18          THE DEFENDANT:  Correct.  And, you know, whatever your
19  decision may be, I would ask that there is some kind of drug
20  treatment involved.
21          THE COURT:  How old are you now?
22          THE DEFENDANT:  Thirty.
23          THE COURT:  And I know that you've gone to AA.  They
24  have an expression there within their traditions, and it talks
25  about singleness of purpose, which basically means that they --

if someone comes and says they have an alcohol problem, they

want to help you with it, to get over it.  If you come there

with some other drug problem, then they may sometimes suggest to

you NA or CA or whatever.

14:44:03   So if you've got an alcohol problem, they feel as if

whatever other problems you've got with chemicals, it's none of

their business.  They're there to help anyone who is an

alcoholic.

THE DEFENDANT:  Yes, sir.

14:44:15   THE COURT:  I'm not as familiar with how NA and CA

works in that regard, if there are similar expressions of

singleness of purpose.  I don't know if your sponsor is a

sponsor from AA, NA?  What --

THE DEFENDANT:  NA.

14:44:29   THE COURT:  NA?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  Well, I think all of the programs

are fine programs, particularly if you find a good sponsor

match.  But if you have had a problem or think you might still

14:44:47   have a problem with alcohol, you might want to take another look

at AA as well.

In regards to this particular case and the victims in

the case, has there been any effort concerning restitution?

THE DEFENDANT:  No, sir.  So far, I haven't been made

14:45:07   aware of what kind of restitution I would owe and who I would

make that payment to.  So there's been no effort, no, sir.

THE COURT:  All right.

THE DEFENDANT:  And --

THE COURT:  I've asked you a lot of questions.  Is there anything you'd like to say in addition to what you already told me?

THE DEFENDANT:  I feel as if I owe a lot of apologies to a lot of different people.

First of all, I would like to apologize to you for having put you in a position to make this decision.  I know it's a difficult decision, and I'm sorry about that.

I want to apologize to Tara.  I'm sorry for, you know, not complying 100 percent with the things I needed to do.

I don't know if anyone is here today, but I would like to apologize to all the victims of my crimes.  I realize, you know, what I did was wrong.  And while I might not have had that attitude while it was going on, I also wasn't taking my medication.  I was in a very bad state.  And, you know, today, after everything I've been through, I'm very sorry.

I would also like to personally apologize to Mr. Bud Miller.  I know my actions created a lot of extra work for him.

I also know that certain people that were affiliated with me made some comments about him which I find deplorable.  I was offended.  And I actually removed those comments myself.

21

It's not something I wanted to be associated with, and I'm very
sorry to him personally that those comments ever got made even
though they were not made by me.

I also want to apologize to you for all the hard work
you've done (indicating).

I'm sure I owe much more apologies than that, but I'll
leave it there.

THE COURT:  All right.  Counsel?

MR. JORDAN:  Nothing further, Your Honor.

At this time, however, if the Court is ready for me to
make a brief statement to the Court as well.

But, Your Honor, I know the sentencing guidelines at
this point are advisory.  And I noted, from the PSR that was
submitted, there was actually some indication that perhaps a
downward variance might be appropriate.

I note in my sentencing memorandum, as well as is
reflected in the PSR, I did present under seal, I believe it
was, some documents from his present treating physician for his
bipolar disorder.  This young man has overcome a lot in his
life.  At 13 he was diagnosed with bipolar disorder.  Tumultuous
childhood where there was some abuse, and he still graduated
with a bachelor's degree from ITT.  He maintained a job there
until this case came out in 2015, actually, and he was
dismissed.

But during that time, Your Honor, he was addicted to

alcohol, addicted to drugs, and I think that's part of what happened to him.

I know the advisory guidelines present, as a Category III, 57 to 71 months, but I think that range, Your Honor, would be unduly harsh for Mr. Wattigney considering all the other factors this Court has to take into consideration.

Number one, his documented mental illness.

Secondly, that's exacerbated by his addiction to alcohol. I think that was part of the impetus for all of this.

And, thirdly, although he does have a criminal history, that criminal history is all reflective of his addictive and self-destructive behavior with alcohol.

And he takes responsibility for that. And it's not an excuse, however, but an explanation to this Court.

Additionally, he's accepted responsibility. From the moment that he met with the prosecutors and the agents, he accepted what he had done and tried as much as he could to assist.

It's a new era when it comes to the computer age. It's not like you do a crime with other individuals who you can point out down the street. This is in a faceless, if you will, world, but he did everything he could to try to, I guess, alleviate what he had done and to assist the efforts of the FBI to continue their investigation of these type of crimes and the knowledge that he had.

1    And, finally, Your Honor, a review of other cases --

2 and there wasn't a plethora of them that I saw -- but a

3 similarity, if you will, of coupon fraud over the Internet.

4    And I related one, *Lucas Henderson*, who was actually

5 the first one who started this.  From what I've seen from my

6 investigation and analysis, he was given credit for time served.

7    I'm not asking for that, Judge, but I'm showing a

8 similar type of case.

9    In Arizona, although a state crime -- some of these

10 were prosecuted in state court -- $25 million of coupons were

11 confiscated, over $2 million in assets.  I'm not sure how much

12 this ring of coupon-fraud individuals got, but two of them got

13 probation and one got two years, just as a reflection of other

14 similar cases.

15    However, going back to this case, Your Honor,

16 Mr. Wattigney truly has an addictive issue with alcohol and with

17 drugs.  He's tried to address that.

18    He does have bipolar disorder.

19    And he committed a crime for which he takes full

20 responsibility.

21    But he's sort of on the first path towards his

22 rehabilitation; that's with remorse.  And he's trying to do

23 everything he can in his efforts to assist the government.

24    And with that, I would like the Court to consider

25 going below the guidelines in this particular case to help

1    Mr. Wattigney along that path.

2             THE COURT:  All right.  Government?

3             MS. JOHNSON:  Well --

4             THE COURT:  Do we have any victim that's here that

5    wishes to make a statement?

6             MS. JOHNSON:  Yes, Your Honor.  We have

7    Mr. Bud Miller, who is the representative of the CIC, and would

8    like to supplement the record on his -- on the victim impact

9    statement, yes.

10            THE COURT:  As I give the defendant a right to make a

11   statement, I also give the victim a right as well.  Does he want

12   to make a statement now?

13            MS. JOHNSON:  Yes, Your Honor.

14            THE COURT:  When you get up here, sir, give us your

15   full name.

16            THE WITNESS:  My full name is Edmond Charles Miller.

17            THE COURT:  Are you otherwise known as Bud Miller?

18            THE WITNESS:  That's correct.

19            THE COURT:  Mr. Miller, what entity, among others, do

20   you represent?

21            THE WITNESS:  I represent the Coupon Information

22   Corporation, which is also known as the Coupon Information

23   Center.  It is a not-for-profit association of manufacturers

24   that issue coupons.

25            THE COURT:  So in the report that I had before me from

14:51:35

14:51:45

14:52:10

14:52:32

14:52:50

1  probation that's already been shared with all of the lawyers and
2  the defendant, when it refers to that entity as CIC, that's the
3  same entity?
4          THE WITNESS:  That's correct.
5          THE COURT:  And the government says you'd like to make
6  a statement on behalf of the victim?
7          THE WITNESS:  Yes, I would.
8          THE COURT:  All right.  Go ahead.
9          THE WITNESS:  Thank you.
10         This is a unique, unprecedented case of counterfeit
11  coupons.  It is our first case on the Darknet, which, as you may
12  know, is a special part of the Internet that you can only reach
13  through specialized software where it strips your identity from
14  all of your interactions.
15         This is the first case where we've seen repeated
16  statements by a defendant acknowledging that he knew what he was
17  doing was illegal while he was doing it.
18         He made statements in his so-called "secret" forum
19  that he knew some day he would be arrested and he would have to
20  face the music.
21         He knew and he specialized in something called "social
22  engineering," which is, frankly, a fancy, new age Internet way
23  of saying how to lie.
24         So he is very adept at doing that and taking advantage
25  of people's trust.

1   THE COURT:  I don't want to cut you off, but I've seen

2   that information.  I've seen him in the e-mails to another

3   person involved here that, you know, he acknowledges his

4   actions.  He acknowledges that he's committing a crime.

5   He has acknowledged, for instance, in one where he's

6   telling someone, "Oh, don't worry, you didn't commit a crime

7   even though you're associating with a criminal like me."

8   I've seen all of that.

9   THE WITNESS:  Okay.  Great.  Thank you.  I appreciate

10  that.

11  This is also the first time we've had such a direct

12  threat against my association, my company, and my staff.

13  THE COURT:  How did you find out about the activity?

14  THE WITNESS:  The activity, in general, it was brought

15  to our attention by Brand Tech Technologies, who showed us some

16  of the activities he was involved in, and then we began our own

17  research after that.

18  THE COURT:  These infringements and losses, the --

19  I've heard various amounts.  How do you determine -- how did you

20  account for the losses?

21  THE WITNESS:  We did not.  Those are not our numbers.

22  THE COURT:  Okay.

23  THE WITNESS:  As far as what got our attention --

24  well, quite a few things got our attention.

25  But, again, this was the first time we've had such

direct threats against our people, including the one lady who
was pregnant at the time.  And we have the full text, but I
think his statement, which I'll quote -- and this is just part
of it, but the rest is not appropriate in a public forum.

"You will no longer have to come to us.  We will come
for you.  We will use force.  We won't play fair."

That's fairly direct.

As soon as we obtained that information, we forwarded
it to the FBI and asked for their advice.  They told us it was a
credible threat.  They gave us some suggestions on how to
enhance our security, which we did take.

And we did read that as both a physical threat and a
cyber threat.  As I'm sure you're aware, a cyber attack, if well
executed, can be devastating.  Target is just one example of
those.

We're also rather, again, surprised at really the
sense of impunity.  This gentleman knew about Henderson,
obviously.  He quoted information about Henderson.  And time and
time again said, you know, "I'm much better than he is."  And,
quite frankly, he was.  Lucas Henderson was an amateur compared
to this individual.

Also Lucas Henderson --

THE COURT:  This is the individual in Arizona?

THE WITNESS:  No, I'm sorry.  Beau.  Beau.  Right.

THE COURT:  Oh.

1       THE WITNESS:  Lucas Henderson really did his criminal

2   acts more for personal gratification of his personality.  He

3   wanted to attract friends and things like that through the

4   so-called "counterfeit coupon community."

14:55:59

5       He did not make a lot of money.  He wasn't in it, you

6   know, for the profit.  He did get some economic benefits, of

7   course.

8       The level of technology used in this case was much

9   more sophisticated than anything we had seen previous to this

14:56:16

10  situation.  When Henderson did his situation, he'd create a

11  counterfeit coupon and basically give it away to as many people

12  as he thought could use it.

13      The defendant in this case had a business operation, a

14  model, if you will, and he made sure that they weren't widely

14:56:37

15  distributed.  It was a subscription basis.  He used something

16  called a QR code, a consumer response code.

17      And it showed so much he knew about the industry and

18  CIC.  He created one that specifically said, you know, "Verified

19  by the Coupon Information Center Corporation's verification

14:56:59

20  service."  There is no operation like that and there never has

21  been.  And, frankly, it provided us with a flag.  His arrogance,

22  frankly, in the situation gave us an opportunity to try to reach

23  out and find more information about what was going on.

24      And one other thing that is really truly significant

25  about this situation is that it is still going on.  When

14:57:18

Henderson was arrested, his activities and the people he
associated with dropped like a rock.

When the folks in Arizona were arrested and
prosecuted -- and some were in jail, some did just do the
probation, that's correct -- their situation dropped
dramatically.  We could see the financial impact almost
disappear.

That's not the case.  The defendant here sold his
business to a group called Team Lotus.  They're up and operating
as we speak.

I'm aware of a communication that they posted on a
website called deep.web.com where they -- on December 29th of
last year, they specifically wrote, "We'll be back better and
faster than ever."  That's right out there on the open Internet
right now.

So it's still going on.  And I don't know --

THE COURT:  Who is the operator of that now?

THE WITNESS:  I'm sorry?

THE COURT:  Who is the principal operator of that now?

THE WITNESS:  Of deep.web, I do not know, I'm sorry.

And I do not know who the individuals are that make up
Team Lotus.  I look forward to finding out some day soon.

THE COURT:  You have been in communication with the
government since then about that?

THE WITNESS:  Yes.

THE COURT:  I have information from the government
here concerning restitution.  And while there's a -- over
$1 million that, I believe, might have been part of this, the
plea agreement here, and the information that we have in that
agreement, speaks of a much lower amount.  Are you aware of that
amount?

THE WITNESS:  Yes, I am.

THE COURT:  Have you agreed to that amount with the
government?

THE WITNESS:  We don't have any agreements in place.

But based upon what's occurred in the past -- and we
have no discomfort, no objection, put it that way.

What's happened in the past is that in the case of
Henderson, you know, $900,000 in restitution, that's essentially
a life sentence for him, and as we've seen from this case, it
didn't provide a deterrence.

We believe, frankly, that the defendant needs
essentially a time-out where he can get the help he needs, but
also not harm the industry or the people, the other victims,
anymore.

And I know there's a thought out there that, you know,
it's just big manufacturers or large corporations that are
victims of this, and, frankly, that's not the case.  Certainly,
they are, but many other folks are.  Particularly small,
independent retailers who received these counterfeit coupons,

and they, frankly, have no real recourse to get compensated for them.

Consumers are victims of this. Manufacturers have to tighten up their policy and their security, and that has been occurring and it will continue to do so.

I've been in communication with a faith-based group called the Simple Truth Foundation. I gave a presentation last year to them, and they are appalled that these type of criminal acts continue to occur.

THE COURT: Are any of these losses, whether it's the plea agreement amount between the government and the defendant or the losses above that -- is any of that insured or in any way covered by something beyond perhaps what --

THE WITNESS: Not to my knowledge.

If you want, I can tell you generally how the financials flow in the industry, if that would be helpful.

THE COURT: Well, I've seen some of the information in some documents that have been submitted to me, but briefly.

THE WITNESS: Okay. Very briefly.

A retailer takes a coupon in good faith and basically extends risk of the value of the coupon --

THE COURT: I understand how the coupons work.

THE WITNESS: Okay. I'm sorry.

THE COURT: I'm only talking in terms of --

THE WITNESS: Just the big money?

THE COURT:  -- protection.

THE WITNESS:  To my knowledge, there is no insurance against any type of coupon fraud that is in place, and either the manufacturers will lose some money or the retailers will lose some money.

And the retail processors also have damage.

And Internet print-at-home companies -- Coupons, Inc., News America, Smart Source -- they lose money because the entire credibility of their type of coupons decrease as these type of criminal acts occur.

THE COURT:  All right.

Paragraphs 24 through 27 describes the coupon information.  And before that, the offense conduct is described in Paragraphs 13 through 23.

All right.  Anything else, sir, that you want to bring to my attention?

THE WITNESS:  No.  I think it pretty well sums up.

Just, again, I would like to, one last time, mention that, again, the creation -- the criminal organization he created, the software he created, still exists and is still being used.

Thank you.

THE COURT:  All right.  I also note that the report also has, at Paragraphs 28 through 29, the defendant's role assessment.

1          Paragraphs 30 through 31:  A summary of the victim

2   impact statement as required by the congressional mandated law,

3   the Mandatory Victim Restitution Act, as well as attachments to

4   that which documents the amounts of the loss.

5          All right.  We haven't had a chance to hear from the

6   government beyond what you have given us in your sentencing

7   memorandum.  Is there anything else the government would like to

8   bring to our attention?

9          MS. JOHNSON:  No, Your Honor.  Basically, we stand by

10  the represented -- the government stands by the representation

11  that we made.

12         And we simply want to bring to the attention of the

13  Court what the victims say, that the defendant used a skill

14  level that wasn't used.  For example, there were -- you know,

15  Apple coupons do not exist, but the defendant manufactured these

16  types of coupons.  And coupons for gift cards do not exist, and

17  the defendant did.

18         Other than that, unless the Court has any questions

19  for the government, we don't have any other --

20         THE COURT:  In a general sense, Mr. Miller described

21  the existence of this software, the existence of an entity, or

22  what have you, that may be doing the same thing as what this

23  defendant has pled guilty to.  Is there anything active or --

24  and if you can't answer that, that's fine.  But I would only

25  encourage that the government pursue this if this is new

1   information.  Or maybe it was not new information, and it's

2   simply waiting on further information.

3   I would simply encourage that the government stay

4   involved to the extent that you can.  I can't order it, because

5   I don't control government investigations or prosecutions, but

6   from what I'm hearing, this potential is still out there.

7   But I do have specific questions about this case in

8   terms of the government's plea agreement with the defendant.

9   As you note -- as both sides note from the presentence

10  report, it speaks about the restitution being $1.8 million and

11  perhaps more.  And the plea agreement here has a specific amount

12  that the government and defendant reached.  I don't have to

13  adopt it.  But you both have recommended to me a lower amount of

14  not quite $75,000.  And as we heard from Mr. Miller, he has no

15  objections to it.  He didn't necessarily agree, but doesn't have

16  any objections to it.

17  How did you arrive at that sum?

18  Was it what he personally profited as opposed to the

19  overall, I don't know, conspiracy involved?

20  MS. JOHNSON:  Yes, Your Honor.  The $78,000 -- $74- --

21  one minute, Your Honor.

22  THE COURT:  $74,855.08.

23  MS. JOHNSON:  Yes, Your Honor.  This amount was the

24  amount of the profit that the defendant made.

25  And between -- between May 26, 2012, and May 26, 2013,

1 he made 1,228 sales that totaled $3,778. And then he made other

2 sales between April 4th and October 2nd. And it is the

3 government's recollection that that is how it was. It was the

4 amount of profit that was made. And it was based on figures

5 that the FBI computed.

6 And the defendant has not denied that -- has agreed

7 with that figure as well.

8 THE COURT: All of this, I guess for lack of a better

9 expression, the electronic crime that we're talking about here,

10 was it -- I know there was some computer forensics done, some

11 investigation about how this occurred. There were some specific

12 examples mentioned in the offense conduct in the paragraphs I

13 mentioned earlier that I reviewed.

14 There was a reference to the offering by the defendant

15 of software that enabled people to generate these offer codes

16 that are used by manufacturers and retailers, and how people

17 then could purchase that software from Purple Lotus and are able

18 to use the codes to generate their own codes and their own

19 coupons.

20 The creation of that software, the actual computers

21 used for all of that, has that all been seized by the government

22 or what?

23 MS. JOHNSON: Yes, Your Honor. The government was

24 able to seize -- and we have the -- an FBI agent here that

25 participated that can also shed some light if the Court has

further questions.

Yeah, the computer was seized.  And one of -- one particular computer, the defendant agreed to forfeit that computer and signed a release form.

15:09:31

THE COURT:  Were they all found at his personal or private residences or some at his place of employment or what?

MS. JOHNSON:  The computers were found at his home.

And the government was also able to corroborate this information from information that it had obtained from secret

15:09:54

servers as well.

THE COURT:  How did he learn how to do that?  Were you able to find that out?

MS. JOHNSON:  We -- the defendant -- I cannot speak on that exact -- the government cannot speak exactly.  But the

15:10:07

assumption is that the defendant is very knowledgeable about computers, as was stated previously.  He was an IT person, very conversant in computers, and --

THE COURT:  Well, the reason I ask that is what I got from the record, what I got from his coworker, and the offense

15:10:28

conduct, it all seems to correlate with the time that he was either a student or working at ITT.

MR. GINSBERG:  Yeah, that's the span for the crime.

The defendant, however, benefited from information that Lucas Henderson, the one who got probation in the Southern

15:10:49

District of New York -- Mr. Henderson had made a manual, and

that manual was available for free.

THE COURT:  You know where I'm heading with this and why I'm asking this.  My reason for asking that is just like, you know, I assume that the government will always be interested in finding out, you know, who's teaching people how to make a bomb.  Well, you know, who's teaching people how to create these codes, software, or whatever to generate these codes?

Is that being taught at some legit or illegitimate program or site?  I'm just concerned about --

MS. JOHNSON:  This is where the defendant, in a way, was very unique.  He was -- it did exist.  The counterfeit coupon business -- since Mr. Wattigney is here, we may -- you know, if he wishes to tell us, we would be happy to learn it.

What the government has been able to gather from the Coupon Information Center is that the counterfeit coupon business online did exist, but it never existed to that level.  Lucas Henderson was the one that started to make it more sophisticated.  And then Mr. Wattigney took that to a very, very higher level.  He kind of perfected what was there.

And that was the difference between Mr. Henderson is that his technique was -- he perfected his technique so well, Mr. Henderson's technique.  Mr. Wattigney's coupons were able to evade detection whereas Mr. Henderson's coupons, some of them, when people went to redeem them, the retailer or the point of sale would be able to detect.

1       And from that, with the advances in technology, the
2   Darknet, that is how.  And now it has kind of taken off on its
3   own.  And now on the Internet, that's why you still have this
4   activity continuing now.
5       And with the name Lotus brand, which was the brand
6   that was established -- and we didn't have a brand name prior to
7   Mr. Wattigney.
8       THE COURT:  I would take it, in addition to the
9   criminal laws that the government has available to investigate
10  and prosecute for electronic-type crimes, that you also have
11  some civil laws seeking injunctive or declaratory relief against
12  persons or entities that are facilitating others to commit
13  illegal conduct.
14      And the thing that comes to mind is the statutory
15  authority that the government has, for instance, at preventing
16  or at least regulating and enforcing regulations that try to
17  prevent or stop people in the pharmaceutical industry from
18  bringing in these precursor chemicals that are used to make
19  illegal drugs, for instance, methamphetamine.
20      I had a case in New York that I presided over, Eastern
21  New York, like that, where a Long Island pharmaceutical company
22  was bringing in the bulk of the precursor chemical that was used
23  to make methamphetamine.  And they tracked not only the bringing
24  in of that chemical, but also records showing that the
25  pharmaceutical was then selling that same chemical to people who

1   were associated, for instance, with certain biker gangs -- I
2   don't want to put all bikers in one category, but certain biker
3   gangs that were involved in methamphetamine sales and
4   production.
5           I'm only pointing that out as other possibilities,
6   because the civil remedies have a lesser burden than under
7   criminal, so maybe there is a civil remedy that is out there
8   that the government has similar to that drug case that I told
9   you about just now.
10          But I'm only just encouraging it.
11          All right.  Anything else from the government?
12          MS. JOHNSON:  No, Your Honor, other than if
13  Mr. Wattigney may want to address -- wishes to address the
14  question of the Court on how he came to learn about this.
15          THE COURT:  Okay.  Thank you.
16          MS. JOHNSON:  Thank you, Your Honor.
17          THE COURT:  Probation, anything else from your side?
18          PROBATION OFFICER:  No, Your Honor.
19          THE COURT:  All right.  Let's go to Mr. Wattigney.
20          Anything that counsel or Mr. Wattigney would like to
21  state in rebuttal to anything that has been brought out so far?
22          MR. JORDAN:  No, sir.  However, Mr. Wattigney did
23  indicate he wanted -- if the Court had an inquiry about how he
24  learned this, he was going to let the Court know that.
25          THE COURT:  Mr. Wattigney, do you want to state

something along those lines?

How did you get involved?  Who taught you how to do this?  What were your interactions, if any, with this fellow Henderson?

THE WITNESS:  I never had any personal interaction with Mr. Henderson.  I did receive his document outlining the process of creating coupons.

THE COURT:  How did you receive it?

THE WITNESS:  It was posted online on different forums.  It would be posted and then someone would come and ban it because it wasn't supposed to be on the Internet.

THE COURT:  Give me an example of a posting or forum.

THE WITNESS:  Well, on 4channel.org they would post coupons and they would post a guide, and the moderators, as soon as they saw it, would go delete it because they realized it was illegal content.  Well, I just so happened to stumble on it one day where I got it, kind of looked it over.

And I would like to make a comment about -- as far as some of these accusations against me.  Now, we talk about Team Lotus still doing the same thing.  There was always a team of people around me.  There was always more than just me.  So some of these things saying that, you know, "Mr. Wattigney made these technical advances," when, in fact, it wasn't me, it was another guy --

THE COURT:  That's why it's called conspiracy.

1    THE WITNESS:  Yes, sir, conspiracy.  And I'm

2  definitely involved with it.

3    THE COURT:  What else?

4    THE WITNESS:  Um...

15:17:24    5    THE COURT:  Is there anything you learned at ITT that

6  honed your skills?

7    THE WITNESS:  No, sir.  I was very professional at

8  ITT.  I graduated valedictorian.  I took my studies seriously.

9    THE COURT:  I'm not asking you that.  I'm asking you

15:17:33  10  whether or not there was anything that ITT taught you that

11  enabled you to --

12    THE WITNESS:  That was not taught to me --

13    THE COURT:  -- improve upon the software?

14    THE WITNESS:  No, sir.

15:17:44  15    THE COURT:  In regards to the computers that you were

16  using, were all these your personal computers?

17    THE WITNESS:  Yes, sir.

18    THE COURT:  And you have given all those to the

19  government?

15:17:55  20    THE WITNESS:  Yes, sir.

21    THE COURT:  Are there any like that that you have

22  either direct or indirect possession of, knowledge about, that

23  you have not informed the government of?

24    THE WITNESS:  No, sir.  I personally do not own a

15:18:07  25  computer at the moment.

THE COURT: Do you understand everything that you're
telling me could be used against you later, particularly if it
is determined that you are lying to me?

THE WITNESS: Yes, sir.

THE COURT: Is there anything you want to retract or
restate?

THE WITNESS: No, sir. I stand by my statements.

THE COURT: And you swear everything that you told me
so far has been true and correct?

THE WITNESS: Yes, sir.

THE COURT: Okay. Both sides submitted?

MR. JORDAN: Submitted by the defense.

MS. JOHNSON: Yes, Your Honor.

THE COURT: All right. This has been certainly a --
even though the Court was not involved in it, I'm certain that
for both sides it's been a complex case to the extent that we're
dealing with a situation where wire fraud, particularly wire
fraud that involves the technology and expertise required to
commit these trademark counterfeiting operations and schemes to
create and sell fraudulent coupons, entails quite a bit of
investigation.

The defendant has pled guilty, admitted his
responsibility for conspiracy to commit wire fraud and
conspiracy to commit trademark counterfeiting for this scheme to
create and sell these fraudulent coupons.

1    It represents his fifth adult criminal conviction.

2    I realize, however, that some of his prior convictions

3    were the subject of 894 proceedings under state law, which

4    allows these to be dismissed once he completes certain

5    conditions, but still can be counted under federal law for not

6    only criminal history category purposes but also, ultimately,

7    for guideline calculations, and I've done that.

8    His prior convictions dealing with DUI, or possession

9    of marijuana and drug paraphernalia, operating a vehicle while

10   intoxicated, gives some insight perhaps into the fact that the

11   defendant, by his own admission and the records that I have

12   before me, has had a history of substance abuse, both in terms

13   of alcohol and prescribed medications.

14   And he also has had a history of other illnesses

15   that's documented in the report and is currently receiving some

16   sort of treatment and medications to manage the disorder that he

17   described earlier.

18   What concerns me in terms of the present situation is

19   that despite the -- despite the opportunities that he was given

20   when he was on probation for his prior offenses, he has shown

21   disrespect for our laws.  He has engaged and advanced himself to

22   a much higher category of crime, this instant offense, than his

23   prior history.

24   So there's a definite need to not only promote respect

25   for our laws, but also to discourage any recidivism or even

similar type of conduct.

He is a smart individual -- at least in terms of book smart, maybe not common sense smart given his involvement in crime.

He has a bachelor's degree in Internet security.

And he has had a decent employment history.

In that regard, the Court is also familiar with the plea agreement between the defendant and the government. This Court cannot engage in plea bargaining. It can only discuss sentencing. It can only discuss the plea agreement to the extent of fashioning an appropriate sentence, one that is not greater than necessary to achieve the goals of sentencing, including the factors pronounced in 18 USC, Section 3553(a), the so-called factors for sentencing including the calculation of the guidelines and consideration of guidelines, which are not mandatory, they're only advisory; as well as the defendant's personal history characteristics; the serious nature of the criminal misconduct; the extent of that conduct involving this rather complex conspiracy; along with many other factors, some of which I've already mentioned.

But I've considered all factors and believe that the following sentence is one that achieves the goals of sentencing.

And the sentence that I would pronounce -- even if I were to sustain all of the defendant's objections, I would have pronounced this same sentence, because in my discretion, I

1    believe that this sentence would be, as I stated just now, the

2    same sentence under an advisory guideline scheme or a

3    recalculated guideline scheme had I adjusted the guidelines

4    downward in view of the defendant's objections.

15:23:31

5            While I have not done that, I certainly wish to make

6    that known.  This is an important point to make in any type of

7    sentencing, because, again, the Court is trying to provide just

8    punishment while promoting respect for our laws, and taking into

9    consideration the characteristics of the defendant, the crime

15:23:53

10   that he has committed, and to promote respect for our laws, and

11   discourage recidivist behavior along with the restitution issue.

12           Restitution is mandated by law.  The probation's

13   report and memoranda submitted and the attachment to the report

14   all indicate restitution is owed.  This being a conspiracy and

15:24:16

15   the nature of this offense and the charge and the guidelines,

16   restitution would be owed jointly and severally with the

17   defendant's unindicted coconspirators, provided they are

18   convicted and it remains outstanding.

19           So pursuant to the Sentencing Reform Act of 1984 and

15:24:41

20   considering the provisions of 18 USC, Section 353, it is the

21   judgment of the Court that Mr. Wattigney will be committed to

22   the custody of the Bureau of Prisons to be imprisoned for a term

23   of 41 months.  That term of 41 months as to Counts 1 and 2 are

24   to be served concurrently.

15:25:01

25           I've given reasons already for this particular

1   sentence.  It's due to the nature and circumstances of the
2   offense, the plea agreement between the defendant and the
3   government, the history and characteristics of the defendant,
4   and to provide restitution to the victims of the offense.

5       The fine is waved because, in view of the restitution
6   requirement, I do not believe that he will be able to afford a
7   fine, but he is still required to pay the restitution.

8       The victim's losses, in my opinion, are in the amount
9   of, in the overall conspiracy, $1,883,369.75.  Almost
10  $1.9 million.

11      However, because of the plea agreement between the
12  defendant and the government, the agreement recommends to
13  consider restitution at a much lower amount.  Having heard from
14  the victim, why they don't necessarily agree with everything in
15  that regard proposed by that plea agreement between the
16  government and defendant, he has not objected to it.  Therefore,
17  the Court, in assessing restitution, will impose the restitution
18  amount as stated in that particular plea agreement.

19      And in that regard, restitution is ordered by
20  Mr. Wattigney in the amount of $74,855.08, which is the amount,
21  according to that plea agreement, that the defendant personally
22  profited from his criminal -- his own criminal misconduct.

23      I realize that this is a conspiracy.  There is a much
24  higher intended loss amount that I've just mentioned.  And I
25  again have stated that there are other possible remedies out

1    there that I'm certain the government is aware of as well.  But

2    for this criminal liability, we'll go along with the amount

3    unobjected to as stated just now.

4           I will also impose, as a part of his sentence, that

5    upon his release from the imprisonment term, the defendant be

6    placed on supervised release for a term in this particular case

7    of three years, which is three years as to each count, one and

8    two, which will run concurrent.

9           Also all the conditions of supervision as mandated by

10   law including but not limited to the condition of not committing

11   any other offenses, not possessing or trying to possess any

12   dangerous weapon, nor any controlled substance except those

13   prescribed by a lawfully licensed physician.

14          You will cooperate in the collection of a DNA sample.

15          And comply with the following special conditions as

16   well.

17          Report to the nearest probation office from your point

18   of release from the Bureau of Prisons's custody within 72 hours.

19          Special conditions.

20          The financial disclosure and the financial

21   restrictions, which means that you have to report to probation

22   all of your finances, and the restrictions condition means you

23   cannot apply for or obtain any loans or mortgages directly or

24   indirectly, along with other conditions in terms of financial

25   restrictions because you have to satisfy the restitution amount.

15:28:08

15:28:39

15:28:58

15:29:17

15:29:42

1    I'll also impose as a special condition drug abuse
2  treatment and testing conditions, the mental health treatment
3  condition, and the maintain full-time employment condition, all
4  at the discretion of probation to assess.
15:29:59
5    Also the costs for all of those conditions depending
6  on defendant's ability to pay.  And, again, I leave that to
7  probation's discretion.
8    The special assessment of $100 per count is also
9  imposed and mandatory.  That is $100 per count so $200.
15:30:21
10    In summary:
11    41 months of imprisonment.
12    3 years supervised release.
13    Restitution in the amount of $74,855.08 even though
14  the overall conspiracy restitution amount I have calculated as a
15:30:44
15  higher amount.
16    Do you understand your sentence, your conditions,
17  Mr. Wattigney?
18    THE DEFENDANT:  Yes, sir, I do.
19    THE COURT:  In regard to appeal rights, even though
15:30:56
20  you may have waived your right to appeal the sentence in any
21  plea agreement with the government, to the extent you have any
22  appeal rights, they begin running today.
23    To file an appeal, you have to file a written notice
24  of appeal within 14 days of today with the Clerk of Court's
15:31:11
25  office.  Otherwise, an untimely notice of appeal can be

dismissed for that reason, as untimely.

     In regards to the appeal rights, you understand that as well?

     THE DEFENDANT:  Yes, sir.

     THE COURT:  All right.  Government, do you have any need for any motions?  Do you have any remaining counts, indictments, or anything else?

     MS. JOHNSON:  No, Your Honor.

     THE COURT:  Okay.  In terms of this particular situation, what is the request in terms of self-surrender or remand now?

     MR. JORDAN:  The defense would ask for self-surrender, Your Honor.  I don't know if there is any objection by the government in that manner.

     MS. JOHNSON:  Your Honor, may I confer with co-counsel?

                         (A pause in the proceedings.)

     THE COURT:  Counsel, does he have family here?

     MR. JORDAN:  Yes, his father is here.

     THE COURT:  All right.  Good.

     MS. JOHNSON:  Your Honor, the government would defer to the recommendations of the pretrial counsel -- the pretrial officer.

     THE COURT:  I've got concerns, Mr. Wattigney, for you, because I think you're under -- I mean everybody -- this has

been stressful for everybody including you.  The victims as
well -- perhaps even more so to some extent, but I'm not going
to get into trying to evaluate that.

THE DEFENDANT:  Yes, sir.

THE COURT:  I am concerned about your recent behavior
while on bond.  And I'm concerned about your health.

THE DEFENDANT:  Yes, sir.

THE COURT:  And I'm going to err on the side of
caution.  I'm going to remand you now because I really think
that you have got some situations here that require addressing.

I would recommend, Marshal, that you notify the
custodian, that he is going to go to, that they evaluate him
mentally.

THE DEFENDANT:  I feel like I'm on the right track
now.

THE COURT:  I might even suggest that within a certain
period of time that he be placed on watch because I've got
concerns.

And I'm not doing that out of punishment,
Mr. Wattigney.  I'm doing that out of concern.

MR. JORDAN:  Your Honor --

THE COURT:  Also I'm recommending to the BOP, for the
41-month period that he's in their custody, that they make
accessible to him programs that can deal with and address some
of the things in the report, including but not limited to the

1  health conditions that I've already reviewed.

2  So to his dad, he has to go now, sir.  Any personal

3  belongings that he has, you can collect them from him.  The

4  marshal will give you the opportunity to give your dad whatever

5  you want to give him right now.

6  Yes, sir.

7  DEFENDANT'S FATHER:  Yes, Your Honor.  I want to say,

8  he's taking certain medication.  He takes anti-seizure medicine

9  that if he quits taking it --

10  THE COURT:  And I'm going to direct that whatever

11  medications that he has and conditions that he has, you tell the

12  Marshal's office for that.  He can tell the Marshal's office

13  that.  It's in the report as well.  So we have all sorts of

14  backup for his medications, because I want him to continue to

15  take his medication.

16  Now, it may be that they might give him a generic.  If

17  that's a problem, then again I think he needs to be medically

18  evaluated to continue receiving all medications that he's

19  required to take.  The marshal will take care of that.

20  Good luck to you and your family, Mr. Wattigney.

21  Thank you, counsel.

22  MR. JORDAN:  Thank you, Your Honor.

23  (Proceedings adjourned.)

24  * * * *

25

15:33:56

15:34:05

15:34:23

15:34:41

1                            CERTIFICATE

2

3        I hereby certify this 12th day of February, 2016, that the

4    foregoing is, to the best of my ability and understanding, a

5    true and correct transcript of the proceedings in the

6    above-entitled matter.

7

8                                    /s/ Mary V. Thompson

9                                    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25